*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARNA MUHAMMAD,

        Plaintiff-Appellant,

v

DETROIT RENEWABLE ENERGY, LLC and
DETROIT THERMAL, LLC,

        Defendants-Appellees.

UNPUBLISHED
January 12, 2023

No. 357792
Wayne Circuit Court
LC No. 19-009648-CD

Before: CAVANAGH, P.J., and O'BRIEN and RICK, JJ.

PER CURIAM.

Plaintiff appeals as of right the trial court's order dismissing her claims for unlawful discrimination on the basis of race, gender, age, and religion under the Elliot Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq*., hostile work environment claims based on the same protected characteristics, and retaliation. We affirm.

## I. BACKGROUND

Plaintiff—an older, African American, Muslim, female—worked at Detroit Thermal for 13 years until she terminated on February 6, 2019. Detroit Thermal is part of the larger Detroit Renewable Energy. Plaintiff started as an entry-level operator in 2005, and was promoted to shift supervisor in 2006. As a shift supervisor, plaintiff reported directly to the plant manager, Ron Kentala, who was a white male.

According to plaintiff, she suffered from numerous instances of discrimination while working as a shift supervisor. In 2008, plaintiff filed a formal complaint with defendants in which she alleged that she was being "harassed regarding an alleged outside job," while "other male employees . . . who have outside jobs" were not experiencing any "adverse consequences." The letter also alleged that defendants had "begun to harass and terminate black employees at an inconsistent level to that of white employees," and that she felt she had "become a victim of this discrimination and harassment." Plaintiff said that she also filed a complaint about this with the Equal Employment Opportunity Commission (EEOC), but was unable to produce that complaint during this litigation.

-1-

Plaintiff also alleged that Kentala sent inappropriate sexual and harassing text messages and emails to plaintiff while she was a shift supervisor, but she was unable to produce the texts or emails. She further recalled "one time [Kentala] called her a bitch." Plaintiff never reported any of these inappropriate communications, however.

According to plaintiff, in another instance of discrimination, Kentala left a less experienced white male shift supervisor in charge of the plant instead of plaintiff while Kentala was on vacation. Plaintiff said that this happened on more than one occasion.

Plaintiff was eventually promoted to plant manager of Detroit Thermal in 2016, replacing Kentala. According to plaintiff, Kentala was reassigned to a different plant, and eventually became a shift supervisor working under plaintiff. In a letter from defendants to Kentala dated March 23, 2016, defendants stated that Kentala intended to "voluntarily resign" but agreed to "a transition period" to "effectuate an efficient transition of [Kentala's] responsibilities." The letter was accepted by Kentala on March 25, 2016.

Plaintiff's salary when she started as plant manager was $130,000, but shortly into her tenure, she found out there was a maintenance supervisor making $140,000. Plaintiff believed that this was unfair and asked for a pay raise, which was granted "a few months later," so that she was earning $140,000 as well.

According to plaintiff, the plant thrived under her management. She testified that she doubled the "steam production" of her plant "over that three years [she] was managing," and that she had never had any "reportable incidences" with regard to safety while she was plant manager, nor did she have any "emission violations."

She did, however, experience certain problems as plant manager. For instance, plaintiff testified at length about problems she had with Don Meeks, an African American male, who worked as a shift supervisor under plaintiff and was thus plaintiff's subordinate. She said that "Meeks was a problem for [her] ever since [she] took the position as plant manager." Plaintiff described Meeks as rude, disrespectful, and insubordinate, and plaintiff believed that he was trying to "sabotage" the plant to make plaintiff look bad. Plaintiff believed that Meeks was insubordinate towards her because she was a woman, and he resented having "a female in charge over him."

Plaintiff said that she also had problems with another shift supervisor, Nicole Sligh, who plaintiff described as being insubordinate as well. Plaintiff believed that Sligh's insubordination was done "to support Don Meeks because they were very close friends." Plaintiff believed that Meeks and Sligh "were working together to sabotage [the plant's] operations because they were unhappy with [plaintiff] being their manager."

Plaintiff also discussed issues she had with other subordinates while plant manager. Plaintiff testified that an hourly employee named Anthony Harris—an African American male— was generally insubordinate and disrespectful towards her. She testified that Harris also filed several union grievances against her, though she could not "recall the specific statements of his Grievances" at her deposition. She said at her deposition that other union-represented hourly employees also filed grievances against her. Plaintiff specifically remembered one grievance against her was filed after she hired her son-in-law, but she said that grievance was dismissed

because she got permission to hire him before the process started. Plaintiff also acknowledged that, at another point, the union raised a complaint that she was showing favoritism to her son-in-law with regard to his time and attendance, but that too was dismissed.

Plaintiff testified about another employee she had issues with, Mike Hoffman, who was also a union member. Plaintiff said that Hoffman was "very angry and hostile" towards plaintiff because she had written him up before and made changes to his department. She testified that Hoffman's "work ethic was lacking," and when she tried to push "the hourly people" to "operate more efficiently" at the direction of management, she "got a lot of push back because they would rather sit down than stand up and do the job correctly." She described the "push back" she was getting as a result of "a culture change" she was enforcing.

Plaintiff also testified about a discriminatory comment that Grayson Goerke, a white male, made towards plaintiff. Goerke worked in a different plant than plaintiff, but while plaintiff was at Goerke's plant one time, he "commented about [plaintiff's] butt in a very sexual manner." Plaintiff further testified that Goerke had been written-up for "telling one of his employees to suck his personal part," and that the employees who worked under Goerke "complained a lot." Another employee testified that Goerke also made "racial statements," but the employee could not remember "any specifics." Despite all of this, Goerke was promoted.

Plaintiff further recalled that while she was plant manager, there was mold in her office. Plaintiff was uncertain whether she first discovered the mold in 2017 or 2018, but was certain that it was never remediated while she was there. Plaintiff acknowledged, however, that she was not forced to remain in that office, and testified that she was relocated to a different work area. Others testified that the current plant manager was still working from the office that plaintiff moved to, that the mold in plaintiff's old office was remediated in 2020, and that the office is now the shift supervisors' office.

Plaintiff also testified about a "managers' meeting" in which bringing in younger people to work at Detroit Thermal was discussed. Plaintiff said that, at the meeting, they discussed "the fact that age had become an issue and we wanted younger people." She said that "[t]hey were even discussing starting an apprenticeship program" to "bring in younger people."

In addition, she recounted problems she had getting a credit card as plant manager, and how no other plant managers had that problem. Plaintiff testified that she repeatedly requested a credit card, and that she was the only plant manager without one. Plaintiff said that "[t]he only difference" between her and the other managers who had credit cards "was that [she] was African American" and "female."

A. EVENTS LEADING TO PLAINTIFF'S TERMINATION

Carl Lockhart, a white male, became the interim chief operating officer (COO) of Detroit Renewable Energy in October 2018. Lockhart testified that during his time as COO from October 2018-December 2018, he "noticed there was some issues" at plaintiff's plant "with plant personnel, the union relationship, safety aspect and overall process management."

On December 4, 2018, plaintiff sent Lockhart an email stating that she was "experiencing difficulties manning and running" the plant "without adequate help from the staff." She explained in her email that she was "always in fire-fighter mode" with her "boots constantly on the ground to the point where [she was] unable to focus on managing the facility versus literally operating it." Plaintiff testified that when she sent the December 4 email, she was "short-handed," "didn't have enough staff," and "didn't have enough funds." She explained that she said she was in "the firefighting mode" because some of the equipment "was starting to fail" and they "didn't have the money to make the repairs." She said that she "had to operate the plant" rather than manage it because they were so short-staffed.

Plaintiff also testified that she asked Lockhart for additional help at the plant. She said that she requested a maintenance supervisor, but never got one. Lockhart acknowledged that plaintiff had requested a maintenance manager while she was plant manager, and explained that defendants were looking for one but had not found the right fit before plaintiff was terminated. After plaintiff was terminated and the new manager took over, Detroit Thermal hired a maintenance manager, electrician, and an additional operator, which added roughly $400,000 to the labor budget.

Plaintiff also said that she spoke to Lockhart about Meeks and let Lockhart know that plaintiff "felt Meeks was sabotaging our operations in the plant."

Lockhart testified that he had discussions with plaintiff and explained to her that she needed "to lead your people rather than manage your people," and that the plant was her responsibility so she needed to "use your people to operate that plant." He elaborated that the problem was that plaintiff "took a lot onto herself" and "didn't use her people." He said that plaintiff needed to "give her people the tools" to do their jobs successfully but "she wasn't understanding about the tools." Lockhart later reiterated that he thought plaintiff was capable of "running the plant, but it[] [was] the leadership of the plant, going to the next level," that was the issue.

Wendy Trust, a white female who worked as a Human Resource Manager with defendants, testified that she referred plaintiff to an executive coach, and explained that she did so "to enhance [plaintiff's] skills as a manager." Plaintiff acknowledged that she was not required to meet with the executive coach, and that she agreed to do so because she thought it could benefit her. Plaintiff testified that she initially viewed meeting with the executive coach "as a positive." Plaintiff also testified that she "asked for reengagement" of the executive coach later, but "the company never responded," so that never materialized.

Richard Pucak, a white male who worked as the executive vice president of marketing and special projects for Detroit Renewable Energy before plaintiff was terminated, testified that Lockhart asked about the possibility of terminating plaintiff in the "first quarter of 2018." Pucak testified that Lockhart wanted to know Pucak's thoughts "about how [plaintiff] was doing." According to Pucak, he told Lockhart that he "had heard that the working environment" at plaintiff's plant "was relatively toxic," and that there were some operational issues. He later said again that he had heard that "the environment of the plant seemed to be very toxic, and very authoritative." He explained that the employees felt afraid to talk about any problems they were having. He said that he had heard these concerns from employees who had expressed them to him.

-4-

Lockhart testified about an example in which he had personally observed plaintiff's management style to be authoritative. Lockhart recounted that at a shift supervisor meeting, he asked "what is going on in the plant," and the shift supervisors "looked at [plaintiff] and asked permission to talk." Lockhart said that was "interesting to [him]" because he would have thought that the shift supervisors "would have been more than happy to talk about . . . what [their] workday was like."

Pucak testified that Lockhart spoke with him about plaintiff again in early 2019. Trust was also at the meeting. According to Pucak, they told him that they were considering terminating plaintiff and asked for recommendations for potential replacements. Pucak testified that he did not "make a recommendation one way or the other." He only "made statements about what [he] knew about the situation at the plant."

Plaintiff recalled a meeting that she had with Lockhart and Pucak shortly before she was terminated at which her Muslim religion came up. Plaintiff testified that, during their meeting, "the call to prayer went off on [her] cellphone." She explained that she "immediately jumped and turned it off and apologized" for the interruption. According to plaintiff, the following exchange then occurred:

> [Lockhart] was saying he was familiar with the calls to prayer, because he was in the military and he heard the call to prayer five time a day throughout his service in the military.
>
> And he relayed a story to me about a time when they were on the road and one of their Humvees came up missing. They thought somebody sold [sic: stole] the Humvee; so they all, you know, went looking for him and once they finally found the Humvee . . . driver, they found him praying. The guy was Muslim and he had stopped on the side of the road to say prayer.
>
> And Carl Lockhart commented, you know, he doesn't know how you got to run a business and you got to stop for prayer five times a day, how do you run a business like that?

Plaintiff said that this comment made her feel "incredibly small" because she felt like Lockhart was saying that Muslims "don't know the proper procedures for, you know, working and efficiency and effectiveness if you got to stop to pray."

Lockhart recalled the conversation with plaintiff that took place after the "call to prayer went off on her phone," but his version differed slightly from plaintiff's. According to Lockhart, he asked plaintiff if she needed to leave, and she said no. He then told her a story about when he was stationed in Kuwait. He said that the point of the story

> was trying to explain to her I understand the Muslim religion because I spent six months living next to a mosque in Kuwait. I dealt with the Kuwaiti Navy all the time every Sunday for six months. I understand the Muslim religion.
>
> My story was to emphasize a lot of people don't understand the Muslim religion. There was a story that my security team was offloading some vehicles, and the

vehicles were being offloaded and they were missing one. When they finally found the missing vehicle, they found the driver, and pulled over to the side of the road and he was praying.

Lockhart did not recall saying that stopping to pray could affect one's workday or productivity. Pucak acknowledged that he was with Lockhart and plaintiff when plaintiff's call for prayer went off on her cell phone, and his recollection of Lockhart's story mirrored Lockhart's telling.

Shortly before plaintiff was terminated in 2019, she received a $30,000 bonus. Trust testified that the bonus "was directed at the performance of the plants, not the individuals." She explained that the plants needed to hit certain performance metrics and the employee needed to stay with the company through a certain date to collect the bonus. Lockhart confirmed that the bonus was not based on "individual performance," but "company-wide performance.

## B. PLAINTIFF'S TERMINATION

Plaintiff was terminated on February 6, 2019. Plaintiff testified that Lockhart and Trust were present when she was terminated. According to plaintiff, when they told her that she was being terminated, she asked if it was something she did, and they both said "no, this had nothing to do with your performance."

Plaintiff also testified that she had "never had an unsatisfactory employee review or evaluation from Detroit Thermal, period." Lockhart confirmed this, and explained that defendants did not have any type of formal employee-review policy. Plaintiff further testified that she never received a "job-in-jeopardy letter," and Lockhart confirmed that plaintiff did not receive any notice that her job was in jeopardy before she was terminated. Trust testified that she did not know if plaintiff was given a "job-in-jeopardy letter," but explained that something like that would not typically be given to someone in a management position. Plaintiff also testified that she was not offered any other position in the company before she was terminated, which Lockhart confirmed.

Plaintiff testified that she believed she was terminated because of her age, race, gender, or religion, even though she was not aware of who was replacing her at the time. When she found out that she was replaced by Philip Malara, a young, white, Catholic male, plaintiff believed it was because defendants "wanted a young white male in that position," and she claimed that her belief was confirmed "because that's the direction they went in. They actually did it."

Lockhart testified that plaintiff was terminated because the company was "going in a different direction, needed new direction and needed a quick turnaround in that company." He explained that the "new direction" was based upon defendants being the sole supplier of steam "to the City of Detroit because of the closing of" another plant. He continued to explain that, to go in this new direction, Detroit Thermal "needed additional process management, safety, employee relations, union employee relations, more focus on that at the" plant.

Trust similarly testified that plaintiff was terminated "because the business was moving in a different direction." She explained that "[t]here was a reorganization of the business that was happening" and they needed to assess who would be able to lead the business after the "reorganization change." Trust said that plaintiff was not terminated based on her performance.

She later elaborated that plaintiff was terminated because "the executive team" was "looking at some of the inefficiencies in the business that they felt needed a course redirection." She listed some of those "inefficiencies" as a poor relationship and engagement with the unions, poor engagement with "the employee base," and a "[la]ck of structure or implementation of policies and procedures."

When asked who made "the judgment or evaluation" that plaintiff could not provide what was needed for the new direction defendants were going, Lockhart said that it was the executive committee—himself, Todd Grzech (Detroit Renewable Energy's CEO), and Thomas Cinzori (Detroit Renewable Energy's CFO). Grzech, however, testified that he did not have a vote or veto about whether to terminate plaintiff. Cinzori similarly testified that he did not have any input into plaintiff's termination.

## C. REPLACING PLAINTIFF

Lockhart testified that the candidates defendants considered to replace plaintiff were Kenya Berman, Adam Collette, and Phil Malara.

Kenya Berman, an African American male, testified that he was offered him the job of plant manager. Berman testified that he declined the position of plant manager and did not attempt to negotiate the salary because he simply did not want "to take on such a role." According to Berman, he was told that if he took the position, defendants would make plaintiff maintenance manager.

Collette, a white male who worked as a shift supervisor under plaintiff, testified that he was never formally considered for the position of plant manager, but Lockhart had asked him if he would be interested in the position at some point. Trust confirmed that Collette was considered for the position, but they determined that "he was too junior for the role."

Defendants eventually offered the manager position to Malara on February 5, 2019, with a starting salary of $110,000, which was accepted. Malara testified that he started working for Detroit Renewable Energy in 2009, in the subsidiary Hamtramck Energy Services (HES), as an entry level operator, which was a union position. He became "supervisor delegate" in 2016. Then, in 2017, Malara became the site manager at HES. Malara testified that he worked at HES until 2019.

Malara and Pucak both testified that they were second cousins. According to Pucak, he advised Trust and Lockhart of his familial relation to Malara after Berman turned down the plant manager position and Malara's name came up as a potential candidate. As discussions about Malara moved forward, Pucak recused himself from the decision to hire Malara. Pucak testified that he recommended that the offer to Malara be at a salary of $105,000.

## D. PROCEDURAL HISTORY

Plaintiff filed her complaint on July 17, 2019, alleging six counts. Plaintiff's first four counts alleged various forms of discrimination under the ELCRA. Count I alleged age discrimination, Count II alleged race discrimination, Count III alleged gender discrimination, and

Count IV alleged religious discrimination. All four counts also alleged that the discrimination subjected plaintiff to a hostile work environment. Count V of plaintiff's complaint alleged a claim for retaliation under the ELCRA.

On March 10, 2021, following discovery, defendants moved for summary disposition under MCR 2.116(C)(10) on all of plaintiff's claims, and plaintiff filed a response on April 16, 2021. The trial court held a hearing on defendants' motion on April 22, 2021, and took the matter under advisement.

The court issued its written opinion on June 22, 2021. The court first addressed plaintiff's claims of discrimination based on race, age, gender, and religion. The court began by noting that all of plaintiff's discrimination claims were based on indirect evidence of unlawful discrimination, which required applying the *McDonnell Douglas*[1] burden-shifting framework. Doing so, the court concluded that plaintiff failed to present evidence establishing the fourth factor—that plaintiff was terminated under circumstances giving rise to an inference of unlawful discrimination. The court reasoned that the evidence presented by defendants established that plaintiff was terminated because "she created a toxic or inappropriately authoritative work environment," and reasoned that plaintiff did not address this claim. The court opined that plaintiff instead focused on comparing herself to Malara (a young white male), but emphasized that, in so doing, plaintiff ignored that the job was first offered to Berman (an older African American male). In further rejecting plaintiff's argument, the court noted that Malara was qualified for the position of plant manager, such that ultimately offering the job to him—particularly when it was first offered to Berman—did not give rise to an inference of discrimination. The court then turned to plaintiff's "lengthy list of discriminatory practices," and concluded that none of them give rise to an inference of unlawful discrimination. The court alternatively reasoned that even if plaintiff could establish a prima facie case of discrimination, defendants had articulated a legitimate, nondiscriminatory reason for her termination—"Plaintiff's issues with the union and her management style, which was found to be toxic and inhospitable to employees"—and plaintiff failed to create a question of fact whether discrimination was a motivating factor in her termination.

The court then turned to plaintiff's hostile work environment claims based on her race, gender, age, and religion. The court walked through plaintiff's arguments, but concluded that all of the claims failed for the same reason—plaintiff failed to present evidence that a reasonable person in plaintiff's position would perceive the communications or conduct she cited as substantially interfering with plaintiff's employment or creating a hostile employment environment. For plaintiff's retaliation claim, the trial court dismissed it because "there [was] absolutely no evidence to support Plaintiff's claim that she was terminated" because of engaging in protected activity.

Plaintiff now appeals as of right.

---

[1] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

## II. SUMMARY DISPOSITION

On appeal, plaintiff argues that the trial court erred by dismissing her discrimination claims, her hostile work environment claims, and her retaliation claim. We disagree.

## A. STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *Michigan Assn of Home Builders v City of Troy*, 504 Mich 204, 211; 934 NW2d 713 (2019). Defendants moved for summary disposition under MCR 2.116(C)(10). In *Maiden v Rozwood*, 461 Mich 109, 119-120; 597 NW2d 817 (1999), our Supreme Court explained the process for reviewing a motion filed under MCR 2.116(C)(10):

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Maiden*, 461 Mich at 120.]

A genuine issue of material fact exists when, after viewing the evidence in a light most favorable to the nonmoving party, reasonable minds could differ on the issue. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

## B. UNLAWFUL DISCRIMINATION CLAIMS

Plaintiff first challenges the trial court's dismissal of her claims of unlawful discrimination under the ELCRA. MCL 37.2202(1)(a) provides, in relevant part:

> (1) An employer shall not do any of the following:

> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

"In some discrimination cases, the plaintiff is able to produce direct evidence of racial bias." *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001). When no direct evidence of unlawful discrimination is available, however, a plaintiff must proceed through the *McDonnell Douglas* framework. *Id*. The *McDonnell Douglas* approach allows a plaintiff "to present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination." *DeBrow v Century 21 Great Lakes, Inc*, 463 Mich 534, 537-538; 620 NW2d 836 (2001). To establish a prima facie case of discrimination under the *McDonnell Douglas* framework, a plaintiff must present evidence that

(1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination. [*Hazle*, 464 Mich at 463.]

"[O]nce a plaintiff establishes a prima facie case of discrimination, the defendant has the opportunity to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Id*. at 464. "If the employer makes such an articulation, the presumption created by the *McDonnell Douglas* prima facie case drops away," *id*. at 465, and the burden moves back to the plaintiff to produce evidence "sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff," *Lytle v Malady*, 458 Mich 153, 176; 579 NW2d 906 (1998). "The inquiry at this final stage of the *McDonnell Douglas* framework is exactly the same as the ultimate factual inquiry made by the jury: whether consideration of a protected characteristic was a motivating factor, namely, whether it made a difference in the contested employment decision." *Hazle*, 464 Mich at 466.

As the trial court noted, it is seemingly undisputed that plaintiff satisfied the first three elements of her prima facie case—she belongs to multiple protected classes, she suffered an adverse employment action, and she was qualified for her position as plant manager. The trial court dismissed plaintiff's claim, however, because it concluded that plaintiff failed to establish the fourth prong of her prima facie case. It further reasoned that even if plaintiff could establish her prima facie case, her claims should nevertheless be dismissed because plaintiff failed to create a question of fact whether discriminatory animus was a motivating factor for her termination.

Assuming without deciding that plaintiff established a prima facie case of discrimination under the *McDonnell Douglas* framework, we agree with the trial court that plaintiff's claim still fails. As observed by the trial court, defendants terminated plaintiff because they wanted to go in a new direction due to plaintiff's poor relationship with the union and issues with her management style, which made it difficult for employees to speak up about potential problems.

Plaintiff does not dispute that defendants made a sufficient showing that they had legitimate, nondiscriminatory reasons for terminating plaintiff, but argues that defendants' stated reasons were a pretext for discrimination. To create a jury triable issue about whether defendants' stated reasons were a pretext for discrimination, plaintiff was required "to show the existence of evidence sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Id*. at 473. She failed to do so.

Plaintiff focuses heavily on the fact that there were no issues with the performance of her duties as plant manager, and, in fact, the plant's production increased under her management. Yet defendants admitted that there were no issues with plaintiff's performance. Indeed, each person involved in plaintiff's termination said as much, and plaintiff testified that, when she was terminated, she was told that it was not an issue with her performance.

Plaintiff otherwise makes a series of arguments for how the evidence in this case "rebuts each of Defendants' alleged rationales for terminating" plaintiff, none of which are persuasive.

She first asserts that the complaints about her managerial leadership were actually the result of not being properly staffed, and that she had told this to Lockhart, who refused to hire the necessary staff until after plaintiff was terminated. Yet Lockhart clearly testified that defendants were searching for persons to fill the positions requested by plaintiff while she was still employed, so plaintiff's assertion that she was "denied" these positions while plant manager is not supported by the record. Moreover, to the extent that plaintiff asserts that Lockhart waited until she was terminated to hire the positions she requested be filled while she was manager, that assertion is speculation, and speculation or conjecture is insufficient to establish that discrimination was a motivating factor for the adverse employment action. *Sniecinski v Blue Cross & Blue Shield of Michigan*, 469 Mich 124, 140; 666 NW2d 186 (2003). Regardless, plaintiff's entire argument related to her managerial style does not actually "rebut" defendants' rationale for terminating plaintiff, as she asserts. While a lack of staff would presumably make plaintiff's job as plant manager more difficult, it does not call into question that plaintiff had an authoritative management style and a poor relationship with the union.

Plaintiff next complains that she had problems with Meeks, that she informed Lockhart and Trust about these problems, and that "Lockhart waited to terminate Meeks until the same week he terminated [plaintiff] from her position." At her deposition, plaintiff acknowledged that as plant manager, Meeks reported to her, she had authority to write him up, and she was involved in Meeks' eventual termination. A letter that effectuated Meeks' termination on January 30, 2019, was attached as an exhibit to plaintiff's response to defendants' motion for summary disposition. The letter was signed by plaintiff. Trust and Lockhart both testified that Meeks was terminated by plaintiff, and that it was plaintiff's decision to terminate him. Accordingly, a glaring problem with plaintiff's argument here is that plaintiff misrepresents the record to the extent she asserts that Lockhart terminated Meeks. The testimony was unanimous that plaintiff terminated Meeks, and plaintiff herself produced the letter in which she informed Meeks that she was terminating him. Moreover, it was undisputed that plaintiff always had the authority, as plant manager, to terminate Meeks. While plaintiff only did so a week before she was terminated, that does not create a triable issue for a jury whether unlawful discrimination was a motivating factor in defendants' decision to terminate plaintiff.

Plaintiff also asserts that her problems with the union "were based at least in part on a change of corporate attendance policy implemented by Human Resources to which the union objected," and on "false charges of favoritism" with respect to an employee to whom plaintiff was related. Yet neither argument "rebuts" that plaintiff had a poor relationship with the union. Rather, each argument attempts to explain the reasons for the poor relationship, but that in no way brings into question defendants' business justification for terminating plaintiff due in part to her poor relationship with the union. As such, the arguments do not tend to raise a question about whether unlawful discrimination could have been a motivating factor in defendants' decision to terminate plaintiff.[2]

---

[2] To the extent that plaintiff seemingly tries to blame defendants for plaintiff's poor relationship with the union by asserting that it was due "in part" to a "change of corporate attendance policy implemented by Human Resources," she does not argue that defendants instituted the change to

Plaintiff further argues that neither Lockhart nor Pucak—who informed Lockhart about problems he had heard about plaintiff's management of the plant—had substantial involvement with either plaintiff or Detroit Thermal before plaintiff's termination. Yet this does not make defendants' reasons for terminating plaintiff pretextual, nor does it tend to establish that unlawful discrimination was a motivating factor in defendants' decision to terminate plaintiff. Indeed, neither Lockhart nor Pucak testified that they had substantial involvement with plaintiff or with Detroit Thermal prior to plaintiff's termination, and Pucak testified that the concerns he relayed to Lockhart were things he had heard from employees who worked under plaintiff at Detroit Thermal.

Plaintiff complains that the concerns Pucak communicated to Lockhart about plaintiff's management being toxic and authoritative were rebutted by the fact that Collette, who worked as a shift supervisor under plaintiff, "completely denied this in his deposition." This, however, is a gross misrepresentation of Collette's testimony. Collette spoke highly of plaintiff's work ethic in managing the plant, and he said that he believed that she "was a fair plant manager to" Collette "personally," but he never denied telling anything to Pucak, nor did he speak to whether plaintiff created a toxic and authoritative environment within the plant. Nothing in Collette's testimony tended to establish that Pucak lied to Lockhart (as plaintiff suggests), such that a reasonable trier of fact could infer that discrimination was a motivating factor in defendants' decision to terminate plaintiff.

Plaintiff more generally argues that defendants' business justification for plaintiff's termination was pretextual because (1) Lockhart's testimony that Grzech and Cinzori were involved with plaintiff's termination was called into question, (2) the persons who terminated plaintiff "were not even involved with the operations of the facility until very shortly before [plaintiff's] termination," and (3) plaintiff was not given any notice about or an opportunity to respond to the reasons she was being terminated. Contrary to plaintiff's assertion, none of this evidence calls into question whether defendants' decision to terminate plaintiff "was lawful, that is, one that is not motivated by a discriminatory animus." *Hazle*, 464 Mich at 465 n 7 (quotation marks and citations omitted). At best, this evidence may call into question whether the decision was "wise, shrewd, prudent, or competent," but that does not raise a question of fact regarding whether defendants' reasons were pretextual. *Town v Michigan Bell Tel Co*, 455 Mich 688, 704; 568 NW2d 64 (1997) (Opinion by BRICKLEY, J.) (quotation marks and citation omitted).

Next, plaintiff argues that the fact she received a bonus shortly before being terminated supports her argument that defendants' stated reasons for terminating plaintiff were pretextual. First, testimony was unanimous that plaintiff's bonus was not tied to her individual performance, but rather to the performance of the plant and whether the person was still employed when the bonuses were awarded. Second, regardless of whether the bonus was tied to plaintiff's individual performance, it is uncontested that plaintiff was not terminated for any reason related to her performance. Thus, the caselaw on which plaintiff relies to argue otherwise is inapposite. The

---

create a reason to terminate plaintiff, or that it was anything other than a neutral application of policy. *Sniecinski*, 469 Mich at 136-137 (explaining that a "neutral operation of" policy that results in an adverse employment action is not evidence that the action was motivated by discriminatory animus).

employee in that caselaw was terminated due to allegedly deficient performance, so the fact that the employer awarded the employee a bonus called into question whether the employer was actually dissatisfied with the employee's performance. See *Cicero v Borg-Warner Auto, Inc*, 280 F3d 579, 593-594 (CA 6, 2002).

Plaintiff further argues that defendants' stated reasons for terminating plaintiff were pretextual because she was more qualified than Malara, the manager that replaced her. The cases to which plaintiff cites for this argument are all failure-to-promote cases, however. In such cases, it logically follows that if a plaintiff is more qualified for a position than the candidate ultimately chosen for the position, then the reasons that the plaintiff was passed over may have been unlawful discrimination. The same is not true in this case. Plaintiff was terminated due to her poor relationship with the union and her management style. That she may have been more qualified than the person who replaced her would not call into question whether the stated reasons for her termination were pretextual so long as her replacement did not suffer from the same problems.

Regardless, plaintiff does not argue that Malara was unqualified for the position, only that she was "more qualified" than Malara, or that Malara was "less qualified" than her. If the comparison is "between two qualified employees," then "[t]he plaintiff's proofs, at most, merely raise questions about [the employer's] business judgment." *Town*, 455 Mich at 704. This in turn does "not create an issue of fact regarding whether the defendant's nondiscriminatory explanation for [the adverse employment action] was a pretext, much less a pretext for discrimination." *Id*.

In one section of her brief, plaintiff raises the fact that she was not offered another position when she was removed as plant manager at Detroit Thermal, and she asserts that this was different from when "white male employees" were "terminated from their jobs." Plaintiff does not cite to any caselaw to support her argument or otherwise articulate how her assertion fits into her broader arguments on appeal, thereby abandoning the issue on appeal. See *Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position."). Regardless, the argument does not warrant relief because the premise of plaintiff's argument is not supported by the record. Plaintiff asserts that "white male employees were assigned to other positions when terminated from their jobs," but the only white male she references is Kentala. Defendants presented unrebutted evidence that Kentala was not terminated, but that he wanted to voluntarily resign, and defendants offered him the opportunity to take a position with less responsibility to prevent his resignation. Thus, the record does not support the premise of this argument.[3]

At one point in her brief, plaintiff also argues that Lockhart's comment related to the Muslim religion amounted to direct evidence of discrimination, and asserts that "[t]he trial court committed reversible error by never analyzing this case as a direct evidence case in light of what [plaintiff] presented." This assertion wholly ignores that plaintiff never once raised this argument before the trial court—not in her complaint, not in her lengthy response to defendants' motion for

---

[3] To the extent that plaintiff may have believed during her deposition that Kentala was terminated, her speculation cannot create a question of fact. See *Sniecinski*, 469 Mich at 140.

-13-

summary disposition, and not during the lengthy oral argument on defendants' motion for summary disposition. By failing to raise this argument before the trial court, plaintiff has waived the issue on appeal. See *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008).

## C. HOSTILE WORK ENVIRONMENT CLAIM

Plaintiff next argues that the trial court erred by granting summary disposition on her hostile work environment claims. We disagree.

To establish a prima facie case of a hostile work environment, an employee must prove that (1) the employee belonged to a protected group, (2) the employee was subjected to communication or conduct on the basis of her protected characteristic, (3) the communication or conduct was unwelcome, (4) the unwelcome conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment, and (5) respondeat superior. *Radtke v Everett*, 442 Mich 368, 382-383; 501 NW2d 155 (1993). For the fourth element, whether a hostile work environment existed is "determined by whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Id*. at 394.

Plaintiff first argues that she was subjected to a hostile work environment on the basis of her gender because she was called a bitch, Goerke made a sexual comment about her, and Meeks' behavior towards plaintiff went unaddressed. In rejecting this argument, the trial court reasoned that the two comments related to plaintiff's gender were made during the 13 years of her employment with defendants, and no reasonable person would have perceived the communications as substantially interfering with plaintiff's employment or having the effect of creating a hostile employment environment. As for Meeks' behavior, the trial court correctly observed that plaintiff's argument that Meeks' insubordinate behavior was due to plaintiff being a female was only supported by plaintiff's testimony, in which she admitted that she merely assumed that to be the case.

On appeal, plaintiff does not explain how the trial court's analysis of her claim was wrong, but merely reiterates the unwelcome communications and conduct underlying her claim. As the trial court noted, however, plaintiff only cited two unwelcome comments that took place during the course of her 13 years with defendants, and plaintiff testified that she merely assumed that Meeks' insubordination was due to plaintiff's gender. As speculation cannot create a question of fact, *Sniecinski*, 469 Mich at 140, we agree with the trial court that, given the totality of the circumstances, a reasonable person in plaintiff's position would not perceive the unwelcome gender-related communications and conduct cited by plaintiff as substantially interfering with plaintiff's employment or having the effect of creating a hostile work environment.

For plaintiff's hostile work environment claim related to race, she claims that she "was repeatedly treated hostilely and differently by Pucak before and after she became Plant Manager as compared to whites," and that Goerke was promoted even though he had been reported for "racial comments." In rejecting this claim, the trial court reasoned that plaintiff failed to provide any evidence that Pucak treated plaintiff differently on the basis of race or that the treatment

-14-

otherwise interfered with her employment or created a hostile work environment. As for Goerke's comments, the trial court reasoned that " 'racial comments' to other employees also does not rise to the level of creating a hostile work environment," particularly given that plaintiff did not work in the same plant as Goerke. Like with the previous claim, plaintiff does not address the trial court's reasoning for dismissing this claim or otherwise explain why the trial court was incorrect to do so. We agree with the trial court's reasoning that plaintiff failed to offer evidence supporting her argument related to Pucak, and that her argument with respect to Goerke does not rise to the level of creating a hostile work environment.

For plaintiff's hostile work environment claim related to age, she cites to a single meeting in which plaintiff was encouraged to go out into the community to recruit young people to work at the plant. In dismissing this claim, the trial court reasoned that the single meeting does not support "[p]laintiff's claim that her employment was substantially interfered with or that it created an intimidating, hostile, or offensive environment." Again, plaintiff does not explain why the trial court's reasoning was incorrect. As explained by our Supreme Court, a single incident will not create an offensive, hostile, or intimidating work environment "unless extreme," and gave as examples of such conduct "rape and violent sexual assault." *Radtke*, 442 Mich at 395. The meeting cited by plaintiff clearly is not the type of "extreme" communication or conduct that would create an intimidating, hostile, or offensive work environment, and thus the trial court's decision to dismiss this claim is affirmed.

Lastly, for her hostile work environment claim related to religion, plaintiff cites to Lockhart's comments about the Muslim religion that he made during a meeting with plaintiff and Pucak. In dismissing this claim, the trial court reasoned that this single incident in which Lockhart commented about plaintiff's religion did not rise to the level of creating a hostile work environment. Once again, plaintiff does not explain why the trial court's reasoning was error. We agree with the trial court that the single incident in which Lockhart commented about plaintiff's religion cannot support plaintiff's hostile work environment claim, as it is not remotely comparable to the type of extreme conduct that would support a hostile work environment claim based on a single incident.[4]

---

[4] On appeal, without context, plaintiff complains that she "underwent Executive Coaching . . . to help her deal with the sexist and racist sabotaging of her management of the plant." As defendants note on appeal, however, defendants offered the executive coaching to plaintiff, and plaintiff voluntarily accepted. Moreover, plaintiff testified that she found the executive coaching useful and requested additional sessions. Without more development from plaintiff, it is unclear the point that she is attempting to make with her citation to the executive coach.

Plaintiff also asserts that her "office was filled with mold affecting her ability to function in her managerial position." As defendants point out on appeal, however, plaintiff does not explain how this can establish a hostile work environment claim—no one intentionally grew the mold in plaintiff's office; plaintiff had the authority, as plant manager, to have the office cleaned; and plaintiff's office was moved and that new office is still used as the plant manager's office. Again, without more development from plaintiff, it is unclear the point she is attempting to make with reference to the mold in her office.

## D.  RETALIATION CLAIM

Plaintiff next challenges the trial court's dismissal of her retaliation claim.  To establish a prima facie case of retaliation, a plaintiff must show:

> (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.  [*Garg v Macomb Cnty Cmty Mental Health Services*, 472 Mich 263, 273; 696 NW2d 646 (2005).]

"To establish causation using circumstantial evidence, the circumstantial proof must facilitate reasonable inferences of causation, not mere speculation."  *Shaw v Ecorse*, 283 Mich App 1, 14-15; 770 NW2d 31 (2009) (quotation marks and citation omitted.)  To prevail, a plaintiff must "show that his employer took adverse employment action because of [the] plaintiff's protected activity . . . ."  *West v Gen Motors Corp*, 469 Mich 177, 185; 665 NW2d 468 (2003).

In the trial court, plaintiff argued that she was retaliated against based on her alleged 2008 EEOC complaint and her complaints about Meeks.  On appeal, she no longer argues that she was retaliated against for the alleged 2008 EEOC complaint, thereby abandoning that argument.

In dismissing plaintiff's claim that she was retaliated against for complaining about Meeks, the trial court reasoned that "there is absolutely no evidence to support Plaintiff's claim that she was terminated because of any complaints she made about Meeks' behavior . . . ."  On appeal, after reciting relevant caselaw, plaintiff only asserts:

> The totality of the circumstances on causation in the light most favorable to [plaintiff] creates a genuine issue of material fact, especially here, where the weighing of evidence and credibility issues are not involved.  A jury should rule on [plaintiff's] retaliation count.

This, however, is insufficient to present the argument for appeal.  Plaintiff does not cite a single fact from which it can reasonably be inferred that she was terminated because she complained about Meeks.  By failing to properly develop the issue, plaintiff has abandoned it on appeal.  See *Walters*, 481 Mich at 388 (explaining that "courts are not the research assistants of the litigants; the parties have a duty to fully present their legal arguments to the court for its resolution of their dispute").

Regardless, there are no facts in the record to support plaintiff's assertion that she was terminated because she complained about Meeks. Accordingly, we conclude that the trial court properly dismissed plaintiff's retaliation claim.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Colleen A. O'Brien
/s/ Michelle M. Rick